# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-0577V**

| | |
|---|---|
| DRITA KAMBERI,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: September 17, 2026 |

*Jonathan Joseph Svitak, Shannon Law Group, P.C., Woodridge, IL, for Petitioner.*

*Julianna Rose Kober, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On January 12, 2021, Drita Kamberi[2] filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[3] (the "Vaccine Act"), which she amended on May 11, 2023. Petitioner alleges that she suffered

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Petitioner's name at the time the petition was filed was Drita Beqiri. The caption was subsequently amended on Petitioner's motion (ECF Nos. 42, 43).

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on October 29, 2020. Amended Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

The parties were unable to settle the claim, and have now briefed entitlement and damages (ECF Nos. 65, 67, 68). For the reasons set forth below, I find that Petitioner likely suffered the residual effects of her condition for more than six months; that the vaccine was likely administered in her left shoulder; that her shoulder pain likely began within 48 hours of vaccination; that no prior or other condition would likely explain her post-vaccination symptoms; that her symptoms originated from and were primarily located in her left shoulder; and that she is otherwise entitled to compensation. For damages, I award **$65,000.00** for actual pain and suffering, plus **$1,194.27** for past unreimbursable expenses.

## I. Factual Evidence

*Pre-vaccination*

Petitioner underwent an annual wellness examination with her primary care provider ("PCP") in August 2018. Ex. 8 at 8-11. Petitioner did not report any left arm problems, and none were found on examination. *Id*. Petitioner next saw PCP on February 7, 2019 for left foot pain. *Id*. at 35. No problems with her left arm were discussed. In the months before vaccination, Petitioner saw her PCP twice (July 2 and August 20, 2020). *Id*. at 99, 128. She did not complain of any shoulder problems, and on examination was noted to exhibit full range of motion ("ROM"). *Id*. at 105, 130.

*Vaccination and Subsequent Health Issues*

Petitioner received a flu vaccine on October 29, 2020. Exs. 2, 16, 17, 21. Petitioner asserts the vaccine was administered in her left arm, although none of the records obtained from the provider indicate the situs of vaccination. Nearly two weeks later (on November 11, 2020), she saw her gynecologist for a routine visit, reporting no significant problems "other than residual pain at flu vax site." Ex. 3 at 21. Her gynecologist advised her to follow up with her PCP for complaints not related to gynecology. *Id*. at 23.

The following day (November 12, 2020), Petitioner saw her PCP and reported "left arm pain from flu shot x 2 weeks." Ex. 8 at 156. Her arm hurt "all the time" from her upper shoulder down her arm, and the pain was worse at night. *Id*. She was unable to move her arm in certain directions. *Id*. On examination, her left shoulder exhibited tenderness at the shoulder joint and upper deltoid, with some limited ROM, especially with overhead motion. *Id*. at 158. Her PCP recommended non-steroidal anti-inflammatory medication, ice, and stretching, with physical therapy ("PT") or an orthopedic consultation as possible next steps if Petitioner's condition did not improve in two weeks,. *Id*. at 159.

On November 17, 2020, Petitioner messaged her PCP that she had been taking anti-inflammatory medication "around the clock," with no resolution to her pain. Ex. 8 at 177. She was unable to sleep and had noticed numbness and weakness, and thought she may need to see a specialist. *Id*. Her PCP referred her for both PT and an orthopedic consultation. *Id*.

Petitioner saw an orthopedist for evaluation of left shoulder pain on November 23, 2020. Ex. 9 at 9. She explained that she had received a flu vaccine about four weeks earlier, and during the injection felt a "pop" in her shoulder. *Id*. She "passed out" and felt pain, and was unable to move her arm immediately afterward. *Id*. She had not seen any improvement with over-the-counter medications, and due to pain she could not move her shoulder at nighttime. *Id*. The pain was localized to her lateral shoulder, although she noticed a tingling sensation throughout her hand. *Id*. On examination, her left shoulder ROM was 150 degrees in forward flexion (compared to 180 degrees on the right). *Id*. at 12. She was assessed with acute pain of the left shoulder, with symptoms "consistent with SIRVA. Likely underlying bursitis." *Id*. at 13. The orthopedist recommended an MRI. *Id*.

Petitioner underwent an MRI of her left shoulder at Norton Healthcare the following day, November 24, 2020. Ex. 23 at 13. The MRI showed rotator cuff tendinosis with bursal sided fraying of the supraspinatus and infraspinatus tendons, low-grade partial-thickness bursal surface tears of the central supraspinatus tendon, no full-thickness or high-grade rotator cuff tendon tear or muscle atrophy, and moderate subacromial subdeltoid bursitis. *Id*. The "comparison" section of the report states that this MRI was compared to November 23, 2020 x-rays – not to a previous MRI. *Id*. However, a medical history form included in the MRI records asking whether Petitioner had previously undergone an MRI is answered in the affirmative. Ex. 23 at 22. The form states a prior MRI was done "Jan 2019" at "Norton WCH." *Id*. (No records of a previous MRI have been filed).

Petitioner returned to the orthopedist to review the MRI on December 2, 2020. Ex. 9 at 44. She was given a steroid injection and prescription pain medication. *Id*. at 44, 62. Petitioner received a COVID-19 vaccine on January 5, 2021. Ex. 8 at 35. The record does not state the situs of vaccine administration.

Petitioner returned to the orthopedist on January 6, 2021. Ex. 20 at 10. She reported "good results" from the steroid injection, with some residual pain at end ROM. *Id*. at 15. She reported no numbness or tingling. *Id*. She was assessed with acute bursitis of the left shoulder, and PT was recommended. *Id*. at 19.

Petitioner underwent a PT evaluation on January 19, 2021 for pain and bursitis of her left shoulder. Ex. 24 at 79. She reported that following vaccination, she had passed out immediately, which had never happened previously, and she had experienced more than the usual post-vaccination soreness. *Id*. The next day, she was in "severe pain" and had to hold her arm like it was in a sling. *Id*. The steroid injection had improved her ability

to move her shoulder. *Id*. She worked as a nurse and was experiencing "a lot of pain with [her] work activities." *Id*. She rated her pain three out of ten, ranging to eight out of ten at worst, and reported significant difficulty with activities of daily living such as bathing, dressing, and lifting. *Id*. On examination, her left shoulder exhibited reduced strength and ROM. *Id*. at 80. The therapist assessed her as having "painful ROM deficits, significant weakness, [and] hypomobile/painful joint mobility." *Id*. at 82.

Petitioner received a COVID-19 vaccine on February 2, 2021. Ex. 8 at 35. The record does not document the injection situs. At a PT session the same day, she reported that her shoulder was "really bothering me today because I came straight from work." Ex. 24 at 69. At her PT session on February 4, 2021, Petitioner stated that she had gotten a vaccine "so my shoulder is sore from that." *Id*. at 65.

On April 1, 2021, Petitioner told her physical therapist that her pain had been increasing, and she planned to undergo a second steroid injection to allow her to better tolerate PT exercises. Ex. 24 32. She now rated her pain seven out of ten, ranging from zero to nine. *Id*.

Petitioner returned to her orthopedist on April 14, 2021, reporting no change with PT. Ex. 20 at 38. Her pain was better than it had been initially, and now came and went, worsening at night when it sometimes woke her. *Id*. A second steroid injection was administered. *Id*. at 37. At a PT session the next day, she stated that her shoulder felt much better after the steroid injection, but her doctor told her she could not receive more injections and surgery would be recommended if her shoulder did not improve. Ex. 24 at 23.

Petitioner received a measles, mumps, rubella vaccine subcutaneously in her left deltoid on May 6, 2021. Ex. 18 at 246. At a PT session that day, Petitioner stated that her shoulder still hurt "a lot," but had been feeling better since the second steroid injection. Ex. 24 at 11. She rated her pain four out of ten, ranging from zero to seven. *Id*. She was discharged from PT on June 14, 2021 after a total of 16 sessions, without having met her treatment goals. *Id*. at 7, 9. She continued to experience moderate difficulty dressing herself, moderate to high difficulty washing her hair, and a lot of difficulty pulling and lifting patients at work. *Id*. at 7. The therapist assessed her status as "improved," and determined that she had a "good prognosis" with a home exercise program. *Id*. at 9.

Petitioner returned to her orthopedist on July 8, 2021, reporting that steroid injections were effective in relieving her pain, but wore off. Ex. 20 at 62. She was unable to move forward with surgery due to other obligations. *Id*. Her ROM was "relatively good," but she continued to experience pain. *Id*. Petitioner was given prescription anti-inflammatory medication. *Id*. at 66. Six weeks later (August 24, 2021), she messaged her orthopedist requesting additional topical medication that had been helpful. *Id*. at 29.

Petitioner saw her PCP on September 16, 2021 for a well-adult examination. Ex. 18 at 249. Her shoulder pain was reported to persist after completing PT, and she continued to follow up with the orthopedist, who said she needed surgery. *Id*. at 255.

Five months later (February 9, 2022), Petitioner messaged her orthopedist requesting support for a workplace accommodation she sought for her left shoulder bursitis, explaining that her job involved a lot of lifting and pulling patients that was aggravating her shoulder. Ex. 20 at 95. Her orthopedist responded that because she had not been seen since July of 2021, she would need to be re-evaluated. *Id*.

The following week (February 17, 2022), Petitioner saw her orthopedist, reporting that she had been doing better, but a couple of weeks earlier she did a lot of pushing and pulling at work that "seemed to reaggravate all of her symptoms." Ex. 20 at 102. Her pain was in the same location as it had been previously, and over-the-counter medication provided some relief. *Id*. Petitioner remained uninterested in surgery. *Id*. at 106. The orthopedist completed forms in support of Petitioner's request for workplace accommodations. *Id*. The following week (February 23, 2022), Petitioner messaged her orthopedist that the paperwork submitted was not adequate, and her employer wanted more details on her restrictions. *Id*. at 94. The orthopedist updated the accommodations paperwork. *Id*. Petitioner has not filed further records.

Petitioner has submitted a declaration in support of her claim. Ex. 1. She states that prior to the subject vaccination, she had no history of pain, inflammation, or dysfunction of her left shoulder. *Id*. at ¶ 6. However, a few hours after vaccination, she began to experience pain and restrictions in her left shoulder ROM that "steadily increased as time went by." *Id*. at ¶ 7. She self-treated with ice and over-the-counter medication, but these treatments did not help. *Id*. at ¶ 8.

Petitioner's declaration, signed on January 7, 2021 – just over two months after vaccination – states that her left shoulder injury "will require treatment for a period of at least six months," without further explanation. Ex. 1 at ¶ 20. Her injury has impacted her ability to cook, dress and undress herself, and help her daughter with her hair; Petitioner herself sometimes needs help with her hair from her daughter. *Id*. at ¶ 18. Pain has disrupted her sleep, which affected her mood and resulted in increased stress and anxiety. *Id*.

Jasmine Jarrett, a nursing school classmate of Petitioner's who saw her weekly at the time of vaccination, submitted a declaration on her behalf. Ex. 11. Ms. Jarrett states that on November 5, 2020, Petitioner "complained of severe left arm pain and weakness when I saw her in class," explaining it resulted from the flu vaccine. *Id*. at ¶ 5. Following vaccination, Ms. Jarrett witnessed Petitioner grab her left shoulder and grimace in pain on several occasions, and struggle to practice some maneuvers in their clinical lab class. *Id*. at ¶ 8.

Sevime Nuhiu, a friend of Petitioner who sees her three to four times a week, submitted a declaration. Ex. 12. On the date of vaccination, Petitioner called her, saying that the injection was so painful that she passed out, and she was now in severe pain. *Id*. at ¶ 5. Ms. Nuhiu had never witnessed Petitioner complain of left arm pain previously. *Id*. at ¶ 6. Four days after vaccination, Petitioner brought her kids to Ms. Nuhiu's house to go to a gymnastics class together; Petitioner asked Ms. Nuhiu to drive "because her left arm was too painful." *Id*. at ¶ 8. On November 13, 2020, Petitioner and Ms. Nuhiu went out to dinner for a birthday celebration, and Petitioner requested help cutting her food due to her left arm pain. *Id*.

Lule Beqiri, Petitioner's sister who sees her once or twice a week, submitted a declaration on her behalf. Ex. 13. Petitioner called her on the date of vaccination, complaining of left arm pain. *Id*. at ¶ 5. They continued to talk about it over the next couple of days. *Id*. Petitioner never had problems with either arm previously. *Id*. at ¶ 6.

Pranvera Abdullah, another sister of Petitioner who sees her at least once a week, submitted a declaration on Petitioner's behalf. Ex. 14. Shortly after vaccination, Petitioner visited her, and was unable to hold her one-year-old child due to left arm pain and weakness. *Id*. at ¶ 8.

Petitioner's spouse, Meriton Kamberi, submitted a declaration in support of her claim. Ex. 15. On the date of vaccination, Petitioner came hold and told him that her left arm was in "excruciating pain." *Id*. at ¶ 5. They expected the pain to go away after a few days; when it did not, they knew something was wrong. *Id*.

Following a few months of medication and treatment, Petitioner told her husband that her pain had improved from ten out of ten to four out of ten. Ex. 15 at ¶ 7. As of August 2022 (when he signed the declaration), her pain remained four out of ten, sometimes going back up to ten. *Id*. Following her injury, Petitioner has needed help with simple tasks. *Id*. at ¶ 8. She has asked their nine-year-old child to help her with bathing and washing her hair. *Id*. She can no longer lift anything heavier than eight pounds, and cannot straighten her left arm when reaching forward, left, or right without excruciating pain. *Id*. at ¶ 9.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section

13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[4] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs*., No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs*., No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying "Qualifications and Aids to Interpretation" ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;

> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

**B. Parties' Arguments on Entitlement**

Petitioner argues that her symptoms persisted for more than six months, citing the record from a May 6, 2021 PT session where she reported persistent left arm pain despite a second cortisone injection. Petitioner's Motion, filed April 25. 2025, at *11-13 (ECF No. 65) ("Mot."). Petitioner acknowledges that she filed her petition two and a half months after vaccination, but contends that this was due to Respondent's proposed removal of SIRVA from the Vaccine Injury Table, which prompted many claimants to file petitions somewhat prematurely, in order to preserve their claims. Mot. at *12.

Petitioner asserts that her medical history does not reflect any prior left shoulder injuries or problems. Mot. at *13. Petitioner contends that Respondent's reference to "underlying bursitis" is a misinterpretation, emphasizing that the orthopedist who referred to underlying bursitis diagnosed Petitioner with acute, or sudden, bursitis and that underlying is not another word for preexisting. *Id*. at *14.

Petitioner views her onset evidence as "clearer than most cases involving onset disputes," noting that she first reported her left arm pain to a healthcare provider two weeks after vaccination. Mot. at *15. At that time, and consistently thereafter, Petitioner related her pain to vaccination. *Id*. at *15-16. Aside from the single reference to tingling in Petitioner's hand, her pain was localized to her shoulder. *Id*. at *18. And none of her treaters related her pain to another condition. *Id*. at *18-19.

In response, Respondent states that he has made numerous requests for additional records, identifying three records that remain outstanding: records associated with visits on January 5 and February 2, 2021, when Petitioner received COVID-19 vaccines; all MRI results dating back three years before vaccination, including a January 2019 MRI referenced in Ex. 23 at 22; and all records documenting any workplace

accommodations/performance records dating to three years before vaccination. Response, filed July 25, 2025, at *7 (ECF No. 67) ("Resp."). Respondent cites my December 16, 2024 order (ECF No. 60) directing Petitioner to file the records requested in the Rule 4(c) Report (ECF No. 59 at *7), which includes these and other records. Thereafter, Petitioner filed Exhibits 25-28, but no further records have been filed.[5] Resp. at *7-8. Respondent states that the outstanding records are "fundamental to his defense," and asks that I make an adverse inference as to their contents or, in the alternative, allow Respondent to obtain a subpoena to acquire the records. *Id*. at *8.

Respondent argues that Petitioner has not established that the statutory severity requirement is met, apparently largely on the basis of Petitioner having filed her petition before the relevant six-month period had elapsed. Resp. at *9. Respondents critiques Petitioner's declaration stating that her injury would require treatment for at least six months, stating that it is unclear how Petitioner knew this, and asserting that later reports made in the context of litigation should be given little weight. *Id*. Furthermore, Respondent suggests that Petitioner's later treatment may have been for unrelated injuries, noting that Petitioner received COVID-19 vaccines in January and February 2021. *Id*. at *10-11. Respondent adds that "[t]he fact that petitioner here initiated PT days after the filing of her petition suggests a primary motivation to support the litigation of her vaccine injury claim rather than to treat any enduring injury." *Id*. at *12.

Respondent also contends that Petitioner has not met any of the SIRVA QAI requirements. Resp. at *14-17. He notes that her orthopedist referred to SIRVA and "likely underlying bursitis," implicitly suggesting that "underlying bursitis" means a pre-existing condition. Respondent also notes that Petitioner's intake paperwork for her November 2020 MRI states that she had undergone an MRI in January 2019, records of which have not been filed. *Id*. at *14-15. And Respondent asserts that, despite working in the hospital where she had previously received care and asserting that her injury affected her work immediately, Petitioner "did not report her shoulder pain until November 12, 2020, two weeks after vaccination . . . [and] did not attribute her symptoms to be 'immediately' post-vaccination until twenty-five days after receiving her flu vaccine." *Id*. at *15.

Respondent considers Petitioner's report of pain and tingling into her arm and hand as demonstrating that her pain and reduced ROM were not limited to the vaccinated shoulder. Resp. at *15. And he asserts it would be "impossible to attribute her symptoms to the flu vaccine specifically," in light of the COVID-19 vaccines received in January and February 2021, in addition to "the regular wear and tear of her job as a labor and delivery nurse." *Id*. at *15-16.

In reply, Petitioner objects to Respondent's suggestion that Petitioner's evidence

---

[5] Exhibit 25 appears to be a COVID-19 vaccination of a different person with a similar, but slightly different, last name, who lives in a different state and has a different date of birth. Thus, it has been stricken.

is entitled to less weight because she contacted an attorney and filed a petition prior to satisfying the statutory severity requirement. Petitioner's Reply, filed Aug. 8, 2025, at *1-2 (ECF No. 68) ("Reply"). Petitioner notes that before she even contacted an attorney about her injury, she had been assessed with SIRVA by her orthopedist. *Id*. And Petitioner asserts that it is "unsurprising" that a person who experiences pain following vaccination, and learns of SIRVA from her orthopedist, might wish to learn more about it, and contact an attorney. Reply at *3.

### C. Respondent's Request for Adverse Inference

The allegedly missing records are not required to resolve this matter, and Respondent has not established grounds for an adverse inference as to their possible content. Respondent states he requested these records on numerous occasions, but cites only his Rule 4(c) Report. This case was activated in January 2023 – over three and a half years ago. If the records in question were vital to Respondent's defense, I would have expected Respondent to request them sooner, and to elevate the issue if they were not provided. Had he done so, it is entirely possible I would have agreed to allow him to seek them by subpoena. But at this late date – after the parties negotiated unsuccessfully, Respondent filed his Rule 4(c) Report, and the parties have fully briefed entitlement and damages – it is now too late to give weight to these contentions.

This is especially so given that the records in question may fill in *some* details, but that it does not appear likely they would affect the outcome of this case. Petitioner received the at-issue vaccine, and was actively treating her injury, *months* before she received the COVID-19 vaccines. The records of those vaccinations do not indicate the situs of administration. And while Respondent requests records of visits associated with those vaccines, it is unlikely that Petitioner received these vaccines during a formal health care examination. In early 2021, COVID-19 vaccines were in limited supply, and distributed through states rather than traditional vaccine distribution channels. M. Plescia, C. Hannan, and J. Baggett., *A Pandemic Success Story: Distribution and Administration of COVID-19 Vaccines*, 28(6) J. Pub. Health Mgmt. Prac. 749-50 (Sept. 23, 2022) (noting that initially, COVID-19 vaccines were administered through community health care centers and large-scale community vaccination clinics).

Respondent's request for an unfiled January 2019 MRI record is more compelling, since it might shed light on a possible related preexisting shoulder condition. But there are reasons to doubt whether such a previous MRI was actually performed. Respondent has not identified, and I have not seen, *any* other medical records suggesting that such an MRI was likely performed at that time. Moreover, Petitioner has filed her primary care records for this period, and they include no record of left shoulder concerns. At Petitioner's August 2018 annual wellness examination, no left arm problems were reported or found on examination. Ex. 8 at 8-11. And her November 2020 MRI was compared to x-rays done the day before – *not* to a previous MRI. In my experience, if a repeat MRI is done

on the same extremity, generally the results are compared to the previous MRI to evaluate whether any current abnormalities were present on the prior scan and, if so, whether they are stable.

Petitioner's November 2020 MRI was performed at Norton Healthcare, and the medical history form in question states the previous one occurred at "Norton WCH," likely a related party. Furthermore, Petitioner has filed billing records from Norton Healthcare, and they do not include any dates of service in January 2019. Exs. 26, 28. Thus, the evidence that has been filed in this case preponderantly establishes that the reference to a January 2019 MRI is erroneous. I also note that the medical history form in question appears to contain handwriting from two different people, but it is not clear who filled in which portions of the form. Thus, it is possible that the reference to a previous MRI was mistaken.

Finally, with respect to Respondent's request for records documenting any workplace accommodations, Respondent has not identified why this request is important. Moreover, it is difficult to imagine a request for workplace accommodations that would be relevant to the issues herein, but that would *not* be otherwise documented in Petitioner's medical records. Such records are not likely to contain information that would affect the outcome of this case.

### D. Factual Findings on Severity

The record as it exists supports a finding that Petitioner likely experienced the residual effects of her condition for more than six months. Assuming onset of Petitioner's pain likely occurred within 48 hours of vaccination (and record evidence supports that conclusion), she must demonstrate residual effects of her SIRVA persisting until the end of April 2021. Between January and June 2021, Petitioner was actively engaged in PT to treat her shoulder injury. Ex. 24 at 7-83. On May 6, 2021 (just after the relevant six-month period), Petitioner told her physical therapist that her shoulder continued to hurt "a lot" despite improvement from her second steroid injection, rating her pain four out of ten. Ex. 24 at 11. This allows me to conclude that the severity period is established.

Respondent's objection on this issue appears to be premised on the fact that the Petition was filed before the six-month period following vaccination had lapsed, at which time she could not have known whether her condition would persist for more than six months. This is literally true – but it does not defeat the claim on the basis of severity.

I have previously acknowledged that many petitions were filed at the end of 2020 and in early to mid-January 2021 as a result of Respondent's proposal to remove SIRVA from the Vaccine Injury Table. *See Ahlstrom v. Sec'y of Health & Human Servs*., No. 21-0596V, 2024 WL 3026057 (Fed. Cl. Spec. Mstr. May 15, 2024) (finding severity requirement met where petition was filed less than six months after vaccination and stated that the claimant's injury "w[ould] require treatment for a period of at least six months");

*Law v. Sec'y of Health & Human Servs*., No. 21-0699V, 2023 WL 2641502 (Fed. Cl. Spec. Mstr. March 27, 2023) ("Based upon the prior concern that SIRVA was to be removed from the Vaccine Injury Table, Ms. Law filed her petition without medical records in January 2021" and finding that the statutory severity requirement was met although petition was filed less than four months after vaccination *and* the claimant sought care for three months, followed by a five-month gap that spanned the relevant six-month period). While unquestionably some of these cases could not *at the time of filing* establish severity, the passage of time (and independent medical record evidence filed thereafter) substantiated that the residual effects of the injury persisted for the requisite six months.

Other decisions have resulted in favorable severity findings even when the case was initiated before the expiration of the six-month timeframe applied to severity determinations. In *Turnquest*, for example, Respondent argued that the statutory severity requirement was not met because the claim was filed prematurely (less than six months after the onset of the petitioner's condition), and the only shoulder-related appointment beyond the six-month mark occurred in response to the Court's concerns about the severity requirement and was thus made "for the purpose of litigation." *Turnquest v. Sec'y of Health & Human Servs*., No. 21-0065V, 2024 WL 3665961, at *3 (Fed. Cl. Spec. Mstr. July 2, 2024). I acknowledged that the claim was filed prematurely, but determined that the record of the post-filing medical appointment contained objective findings demonstrating that Petitioner's shoulder impairments persisted, thus satisfying the severity requirement. *Id*. Similarly, in this case, although much of Petitioner's care occurred after the petition was filed, during that time she exhibited objective deficits in shoulder function, including reduced strength and ROM in PT, and received a steroid injection.

What matters in such cases is whether medical record evidence shows that a person experienced residual effects of an injury for six months. While anticipating that this will occur is of course insufficient to meet the requirement, the evidence itself can later do the job. The records in this matter clearly meet the severity requirement.

**E. Factual Findings Concerning Situs**

The record supports a finding that Petitioner likely received the flu vaccine in her left shoulder. Although the vaccination records do not document the injection situs, her post-injury treatment records consistently support a finding that the vaccine was administered in her left arm. Petitioner saw her PCP two weeks after vaccination complaining of "left arm pain from flu shot x 2 weeks." Ex. 8 at 156. When she saw an orthopedist, she reported left shoulder pain resulting from a flu vaccine. Ex. 9 at 9. At her PT evaluation for left shoulder pain and bursitis, she related her pain to her October 2020 flu vaccination. Ex. 24 at 79. And no records suggest a different situs.

### F. Factual Findings Concerning Onset

Petitioner initially sought care for her shoulder pain just two weeks after vaccination. She did not attend any intervening medical appointments (which could raise questions if they were apparent opportunities to seek care that Petitioner did not avail herself of). While seeking treatment, she consistently reported the onset of shoulder pain close-in-time to vaccination.

Respondent's onset objection is premised on Petitioner not reporting her shoulder pain to a treater until two weeks after vaccination, although she works in a hospital where she had previously sought medical care and alleged that her shoulder pain affected her ability to work within two days of vaccination. But simply working in a hospital does not translate into an ability to obtain immediate care for a painful, but not life-threatening, condition. The same is true for a condition that causes some impact to a person's ability to perform work duties.

Although Respondent suggests that Petitioner did not report immediate pain until later (which, even if correct, would not automatically call onset into question), at Petitioner's first appointment with her PCP two weeks after vaccination, she reported a two-week history of pain. And no evidence suggests a later onset.

### G. Petitioner has Established that She Did Not Have a Prior Shoulder Condition, or Any Other Condition, That Would Explain her Post-Vaccination Symptoms

Respondent's position as to whether Petitioner has a prior left shoulder condition is premised on a single record reference to a prior MRI having been performed pre-vaccination, in January 2019, and the orthopedist's statement that Petitioner had "likely underlying bursitis." As stated earlier in response to Respondent's request for an adverse inference for failure to produce a January 2019 MRI, the preponderance of evidence suggests that Petitioner did not in fact undergo a left shoulder MRI in January 2019, or have any prior left shoulder condition. And even if she did, an MRI over a year and a half earlier, with no actual treatment or other evaluation, does not alone suggest an injury serious enough to explain Petitioner's symptoms following vaccination.

The orthopedist's reference to "underlying bursitis," also is not enough to be deemed proof of a *pre-existing* condition. There is no other indication in the orthopedist's record suggesting that Petitioner had pre-vaccination left shoulder bursitis, or any other left shoulder condition. Respondent appears to imply that the word "underlying" means "pre-existing," but this is not necessarily the case. The primary definition of "underlying" is lying beneath or below; basic, fundamental. *Underlying*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/underlying (accessed Sept. 16, 2026). Given that Petitioner's medical records do not document any prior left shoulder conditions, the orthopedist's reference to "underlying" bursitis is more likely meant to

provide an explanation for Petitioner's symptoms that could not be visualized without advanced imaging, than refer to a pre-existing condition.

To the extent that Respondent suggests that Petitioner's receipt of COVID vaccines in January and February 2021, and the demands of her job, prevent her from meeting the fourth QAI, these are not "conditions" within the meaning of that requirement either. Furthermore, the COVID vaccination records do not record the situs of vaccination. And Respondent has not explained why he believes Petitioner's work duties would cause her to suddenly develop shoulder pain and reduced ROM after vaccination.

### H. Petitioner's Pain and Limited ROM were Primarily Located in, and Originated in, Her Left Shoulder

Respondent cites a record in which Petitioner reported pain and tingling into her arm and hand. Resp. at *15 (citing Ex. 8 at 172). I have previously found, however, that references to symptoms originating in a claimant's shoulder and resulting in incidental symptoms elsewhere do not necessarily prevent satisfaction of this SIRVA element. *See Valdez v. Sec'y of Health & Human Servs*., No. 21-0394V, 2024 WL 1526536, at *6-7 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (finding third QAI satisfied despite pain radiating to upper arm and forearm because the petitioner *primarily* experienced a shoulder injury consistent with SIRVA); *Cross v. Sec'y of Health & Human Servs*., No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Dec. 2, 2022) ("claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body, since the essence of the claim is that a vaccine administered *to* the shoulder *primarily* caused pain there") (emphasis in original).

The record Respondent cites appears to be Petitioner's explanation for why she wanted to see her PCP on November 12, 2020. The record states "[p]ain in arm after flu shot for over 2 weeks. Not able to move arm. Tingling in arm and hands." Ex. 8 at 172. At that appointment, Petitioner reported pain in her "[u]pper shoulder and down L arm." *Id*. at 156. This record is otherwise silent on any symptoms beyond Petitioner's shoulder. Thus, this record refers to incidental symptoms originating in Petitioner's left shoulder and radiating down her arm and hand.

Petitioner also reported pain localized to her shoulder, but accompanied by a tingling sensation in her hand, to her orthopedist. Ex. 9 at 9. Her orthopedist assessed that her symptoms were "consistent with SIRVA." *Id*. at 13. This record also suggests that Petitioner's pain was primarily limited to her left shoulder (and I can for purposes of calculating damages disregard stray non-shoulder references, especially since the thrust of Petitioner's treatment focused on a SIRVA).

### I. Factual Findings on Remaining Statutory Requirements

The remaining statutory requirements are not disputed, and I find that they are satisfied. Petitioner received a covered vaccine in the United States. Exs. 2, 16, 17, 21. And she states that she has never received compensation in the form of an award or settlement for her vaccine injuries, nor has she filed a civil action. Ex. 1 at ¶¶ 21, 22.

Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III. Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs*., No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[6]

### B. Parties' Damages Arguments

Petitioner seeks a pain and suffering award of $82,500.00, citing *Starnes* and *Lambert*, in which claimants were awarded $78,000.00 and $80,000.00, respectively.[7] Mot. at 24-26. She asserts that she suffered a severe SIRVA immediately after vaccination, seeking care after just two weeks and reporting constant pain and limited ROM, with no relief from around the clock anti-inflammatory medication. *Id*. at *24. She

[6] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[7] *Starnes v. Sec'y of Health & Human Servs.*, No. 20-1514, 2023 WL8110730 (Fed. Cl. Spec. Mstr. Oct. 13, 2023), and *Lambert v. Sec'y of Health & Human Servs.*, No. 21-1275V, 2025 WL 1078788 (Fed. Cl. Spec. Mar. 10, 2025).

treated her injury with two cortisone injections and 16 PT sessions. *Id*. The cortisone injections relieved some of her pain, but only temporarily. *Id*. at *25.

Petitioner views her injury as persisting for over 15 months. Mot. at *25. When she returned to her orthopedist in February 2022, although she had aggravated her shoulder at work, she described her pain as being in the same location. *Id*.

Respondent proposes an award of $57,500.00, citing *Winkle*, *Alcantara*, *Miller*, *Niemi*, and *Clendaniel*, with awards ranging from $60,000.00 to $75,000.00.[8] Resp. at *17. Respondent characterizes Petitioner's injury as mild and limited, with Petitioner undergoing an MRI, PT, and two steroid injections. *Id*. at *20. Respondent emphasizes low pain levels, citing a March 2021 record reporting pain up to two out of ten. *Id*. at *18 (citing Ex. 24 at 41) – acknowledging that the following month, Petitioner rated her pain nine out of ten at worst. Ex. 24 at 30.

Respondent contends that Petitioner's vaccine injury resolved in less than one year. Resp. at *18. Although Petitioner attempts to link her sole appointment in February 2022 – following a five-month treatment gap – to her vaccine injury, Respondent asserts that at that time, Petitioner reported that she had "reaggravated all of her symptoms" at work "a couple of weeks" earlier, *Id*. at *18-19 (citing Ex. 20 at 103).

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

I find that Petitioner suffered a mild to moderate SIRVA that persisted for close to a year. Her ROM deficits were mild at all times. However, her pain levels ranged from minimal to severe. And she sought care just two weeks after vaccination, suggesting a more concerning injury. Although steroid injections alleviated her pain, their effect wore off. Petitioner sought care consistently, with no meaningful gaps. She treated with two cortisone injections and 16 PT sessions. Her orthopedist offered surgical treatment, which Petitioner declined.

Petitioner's return to care in February 2022 after a five-month gap, however, is not sufficiently linked to her vaccine injury to warrant consideration in damages. At that time,

---

[8] *Winkle v. Sec'y of Health & Human Servs.*, No. 20-0485V, 2022 WL 221643 (Fed. Cl. Spec. Mstr. Jan. 11, 20220; *Alcantara v. Sec'y of Health & Human Servs.*, No. 20-09990V, 2022 WL 2800868 (Fed. Cl. Spec. Mstr. June 10, 2022); *Miller v. Sec'y of Health & Human Servs.*, No. 20-604V, 2022 WL 3641716 (Fed. Cl. Spec. Mstr. July 22, 2022); *Niemi v. Sec'y of Health & Human Servs.*, No. 19-1535V, 2022 WL 3135258 (Fed. Cl. Spec. Mstr. July 5, 2022); and *Clendaniel v. Sec'y of Health & Human Servs.*, No. 20-0213V, 2021 WL 4258775 (Fed. Cl. Spec. Mstr. Aug. 18, 2021).

Petitioner reported that she had been doing better until a couple of weeks prior when work duties resulted in the return of her symptoms.

Petitioner's injury course is highly similar to that in *Alcantara* and *Clendaniel*. Those petitioners also suffered mild ROM deficits and sought care less than a month after vaccination. The *Alcantara* claimant sought treatment sooner, just four days after vaccination, while the *Clendaniel* claimant waited longer, nearly a month. Their injuries persisted somewhat longer than Ms. Kamberi's, although she appears to have reported higher pain levels. The *Alcantara* petitioner attended more PT and underwent more injections than Petitioner, while the *Clendaniel* petitioner did not attend PT at all, and (like Ms. Kamberi) underwent two steroid injections.

Taking these factors into consideration, an award of **$65,000.00** for pain and suffering is appropriate in this case.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $65,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[9] Additionally, I find that Petitioner is entitled to **$1,194.27 in unreimbursable expenses**.[10]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $66,194.27, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[11]

---

[9] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[10] The parties agree that this sum is reimbursable. Mot. at *27; Resp. at *24.

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master